Reeves *v.* Scott.

Kenneth R. Reeves *vs.* Ralph Chioini Scott & others.

Suffolk.    March 9, 1949. — September 16, 1949.

Present: Qua, C.J., Lummus, Ronan, Wilkins, Spalding, &
Williams, JJ.

*Unlawful Interference.   Labor and Labor Union.   Equity Pleading and
Practice,* Assessment of damages, Bill.  *Constitutional Law,* Due process
of law.

Engaging, by one who by profession is a leader of orchestras or bands
and a booker, organizer or employer of orchestras or bands, in the
business of furnishing musical services to those members of the public
who desire them, is a property right protected by the common law
and guaranteed by arts. 1 and 10 of the Declaration of Rights of the
Massachusetts Constitution and by the Fourteenth Amendment to
the Federal Constitution.

A demand, by a union comprised of musicians practising their profession
in the vicinity of Boston, upon proprietors of hotels who employed
only members of the union and with whom the union had no trade
dispute, that the proprietors compel persons, hiring rooms in the hotels
for social functions and employing orchestras to play at such functions,
to employ only members of the union and to refrain from employing
orchestras furnished them by an independent leader who employed
nonunion members, accompanied by a threat that, in the event of
noncompliance with the demand, a strike would be commenced against
the proprietors, was illegal and unjustifiable, the proprietors being
strangers to the controversy of the union with the independent leader;
and, in a suit in equity by the independent leader, the union should
be enjoined from coercing, persuading, or attempting to coerce or
persuade the proprietors to refuse to permit the plaintiff to furnish
orchestras to play at such functions.

A plaintiff, an orchestra leader, who had established in a suit in equity
a right to enjoin wrongful interference by the defendant, a labor union,
with a business conducted by him as a booker, organizer, or employer
furnishing orchestras to members of the public desiring them, also was
entitled in the same suit to assessment of damages caused by such
unlawful acts of the defendant.

A bill in equity against a labor union, based on alleged unlawful interfer-
ence by the defendant with a business of the plaintiff and containing
only two express prayers, one for a temporary injunction and one for
damages, was construed as containing a general prayer for relief under
which a permanent injunction against such interference should be
issued.

BILL IN EQUITY, filed in the Superior Court on August 8, 1947.

The defendants in their answer admitted the truth of the following averments of the bill:

"The plaintiff is by profession a leader or conductor of dance orchestras or bands. In addition he acts as a booker, organizer or employer of dance orchestras or bands. Pursuant to this line of business he solicits the business of persons desiring to secure dance orchestras or bands to play at banquets, weddings, parties or other functions and employs and furnishes orchestras or musicians to perform at such functions. These functions are usually held at hotels, halls or other public places. The usual procedure is that the person or organization conducting the particular function rents space at some hotel or hall and then enters into an arrangement or agreement with the plaintiff for an orchestra."

The suit was heard by *Morton*, J., by whose order a final decree was entered dismissing the bill. The plaintiff appealed.

In this court the case was argued in March, 1949, before *Qua*, C.J., *Lummus, Ronan, Wilkins,* & *Williams*, JJ., and after the resignation of *Dolan*, J., was submitted on briefs to *Spalding*, J.

*D. Burstein*, for the plaintiff.

*M. T. Hall*, (*J. T. Day* with him,) for the defendants.

RONAN, J. This is an appeal from a final decree dismissing the bill brought by the plaintiff against certain officers of Boston Musicians' Protective Association Local No. 9, American Federation of Musicians, a voluntary association, hereinafter called the union, to restrain the members of the union from interfering with his business, and for damages.

The plaintiff has been engaged for several years in the business of conducting orchestras and furnishing them to various organizations and individuals who required music for dances, banquets, weddings or other social affairs. Prior to the summer of 1943, a principal part of the plain-

Reeves *v.* Scott.

tiff's business was the furnishing of music at the various hotels in Boston for such social affairs as were conducted by private parties who had hired rooms for the purpose from the hotel and who engaged the plaintiff to supply the music.

The union is comprised of persons who play various musical instruments and are engaged in the vicinity of Boston in furnishing music in theatres, hotels, radio broadcasting stations and halls which are let for social functions. It is a branch of the American Federation of Musicians, hereinafter called the federation, which in turn is affiliated with the American Federation of Labor. The union by-laws forbid its members to play in an orchestra or band with nonunion members, or to render musical services in a building or place classed as unfair. The by-laws of the federation forbid a member to accept an engagement from a booking agent who has not been licensed by the federation.

The plaintiff was a member of the union for a few months and resigned in June, 1942, after he had been found not guilty on certain charges and while a matter was pending for further investigation by the union. The evidence shows violation of the by-laws of the union by the plaintiff. His application filed in September, 1943, for readmittance to the union has never been finally acted upon by the union, and it is apparent that, by reason of considerable feeling manifested against him by officers of the union, the application will not be granted. As the plaintiff does not now seek readmittance to the union, we need not decide that matter. See *Maguire* v. *Buckley,* 301 Mass. 355; *Walter* v. *McCarvel,* 309 Mass. 260.

The principal hotels in Boston have for many years regularly employed orchestras or bands, comprised only of members of the union, in the dining rooms, dance halls or other places in the hotels which were under the immediate supervision of the hotels and where music was furnished for the entertainment of their guests. It was the practice of these hotels to let rooms to private parties to conduct various social affairs. The hotels merely let the space and

did not concern themselves in any way with the selection of those who were to perform musical services at such affairs. That matter was left entirely to those who hired the rooms.

The plaintiff and others engaged in a business similar to his were competing with members of the union in furnishing musical services especially at these private functions sponsored by those who had hired rooms at a hotel. There was an open market for this work when the present controversy between the plaintiff and the union began. The conflict was precipitated by the desire of the union to secure this work for its members. Minor skirmishes occurred. The plaintiff, who had been hired by different parties to furnish music at the Copley Plaza Hotel in May, 1943, at the Bradford Hotel in May, 1943, and at the Hotel Sheraton in December, 1947, was prevented from doing so by the interference of the union, which compelled these third persons to discharge the plaintiff and to secure an orchestra of union members. The bitterness of the struggle and the attitude of the union toward the hotels may be illustrated by one of these instances. With reference to the episode at the Bradford Hotel, for example, the judge found that an officer of the union notified the person who hired the plaintiff that there would be no music at the contemplated social affair and, just before the affair began, this official "with several policemen about" appeared at the hotel with two orchestras comprised of members of the union. He told the manager of the hotel, "Get rid of Reeves and if you don't you'll get into trouble." The manager told the person sponsoring the affair to discharge the plaintiff "or out you'll go unless you take the union band." The union official then warned the hotel manager to "watch your step. Reeves will get his," and "you'll have no more music at the Bradford if you hire Reeves." The management of the Hampshire House was threatened with picketing if it did not cease to employ the plaintiff and other nonunion orchestras. On another occasion, a member of the union was discovered playing in an orchestra which the plaintiff was conducting

at Hull, refused upon the request of the president of the union to° stop playing immediately, was fined $500, and was suspended from the union. He has since continued to play in the plaintiff's orchestra. In August, 1942, the official journal of the union, which was distributed to its members, contained a notice that the plaintiff and another were no longer members and that members of the union should govern themselves accordingly. Similar notices appeared in subsequent publications.

The hotels controlled the places of employment of musicians at these private social functions and consequently were in a position to control this source of employment of those who competed with the union. Competition would be eliminated if the hotels refused to permit nonunion musicians to work at these social functions. The union, although it had no trade dispute with the hotels, passed a vote on April 1, 1943, that its members would refuse to render musical services at the hotels after July 1, 1943, "and request the A. F. of M.[1] to do likewise with its members" unless the management in letting rooms to others for social functions should insist that the music for such affairs be furnished only by members of the union. An association comprising all the principal hotels in Boston agreed on July 8, 1943, to comply with the vote of the union. The plaintiff has since been unable to secure employment at these hotels.

The plaintiff had the right to engage in the business of furnishing musical services to those members of the public who desired them, and such a right has always been recognized in this Commonwealth as a property right protected by the common law and guaranteed by arts. 1 and 10 of the Declaration of Rights of the Constitution of Massachusetts and by the Fourteenth Amendment to the Constitution of the United States. The principle is too firmly established in this jurisdiction to require the citation of many decisions. See, for example, *Goden* v. *Niebuhr*, 236 Mass. 350, 351;

[1] "A. F. of M." is the American Federation of Musicians with which the union was affiliated.

*Saveall* v. *Demers*, 322 Mass. 70, 75. The burden is upon
one who interferes with the lawful conduct of another's
business to show that the interference was justified by the
exercise of an equal or superior right and was carried out
by lawful means. *Quinton's Market, Inc.* v. *Patterson*, 303
Mass. 315, 317. *Keegan* v. *O'Donnell*, 310 Mass. 346, 350.
*Colonial Press, Inc.* v. *Ellis*, 321 Mass. 495, 500–501. The
members of a union have the right to compel their employer
to give them all the available work of the particular kind
which they are competent to perform even to the exclusion
of others. *Pickett* v. *Walsh*, 192 Mass. 572. *Hoban* v.
*Dempsey*, 217 Mass. 166. *Tracey* v. *Osborne*, 226 Mass.
25. *Shinsky* v. *O'Neil*, 232 Mass. 99. The hotels, however,
were not the common employers of union and nonunion
musicians. They had always employed union musicians
in all affairs conducted by the hotels, but they did not
employ those who rendered musical services at these private
functions either before or after July 8, 1943, and they never
agreed to hire union members for such functions. Con-
sequently, the principle upon which the union relies is
not applicable. The distinction between a demand by
a union that an employer give members of the union all his
work in their trades, with a threat that otherwise they
will do none of his work, and a demand upon an employer
with whom the union has no trade dispute that he see to it
that members of the union are substituted for nonunion
men who are working for one with whom the employer has
business relations, with a threat that otherwise a strike will
be commenced against the employer, is clear. This dis-
tinction was pointed out in *Burnham* v. *Dowd*, 217 Mass.
351, at page 356, where it also was stated, "the members of
a labor union who are employed by a contractor to do work
upon a building, and who have no dispute with that con-
tractor as to work which they or their fellows are doing for
him, cannot lawfully strike against him for the mere reason
that he is doing work and employing some of their fellows
upon another building upon which non-union men are em-
ployed to do like work, not by him, but by the owner of

that building." The first demand is lawful and enforceable against the employer, but the second is illegal and unjustified, being directed against a stranger to the controversy to compel him to compel another to yield to the union's demands.

The judge made no finding that the hotels had freely and voluntarily entered into the agreement of July 8, 1943, and consequently it is our duty to examine the evidence and to decide for ourselves this question of fact. *Lowell Bar Association* v. *Loeb*, 315 Mass. 176, 178. *Gordon* v. *O'Brien*, 320 Mass. 739, 740. There is no evidence bearing directly upon the question. There is nothing to show that the hotels were not satisfied to leave the selection of the musicians to those who hired rooms for social functions, or that the hotels would not have continued to manage and conduct their business in this manner except for the action of the union. Leaving the selection of musicians to those who hired the rooms was apparently the most advantageous method for the hotels to adopt in conducting this branch of their business. When apprised of the vote of the union, the hotels were required to decide whether they could conduct their business without any musicians; or whether it would be better to substitute nonunion musicians for those belonging to the union and its affiliate, the federation, if that were possible, having in mind that twenty-eight hundred musicians residing in the vicinity of Boston belonged to the union, and whether such a substitution could be made without the hotels becoming involved in serious difficulties with other unions whose members were employed in the hotels. The record is barren of any possible advantage that would accrue to the hotels from the elimination of nonunion musicians at these private functions, and we are unable to discover any. The demand of the union that nonunion members be barred from working at these private functions takes color and meaning when considered in the light of the situation then prevailing. The hotels knew that they would "get into trouble" if the plaintiff were permitted to work at these private social affairs, and the inference is not unwarranted that they con-

sidered the demand as a threat of a strike unless they became an instrumentality of the union to inflict an intentional injury upon the plaintiff with whom the hotels had no dispute. A threat of a strike to compel the hotels to close their doors to the plaintiff and to prevent others from dealing with him is a threat of an unlawful strike, and the pressure generated by the threat was as potent as a strike itself would be, for it accomplished the same purpose. The union has not sustained the burden of proving that the hotels had freely and voluntarily yielded to its demands. We do not intimate that, if the hotels willingly combined with the union, the conclusion would be different. We simply decide that the union could not compel the hotels to join with the union in its contest with the plaintiff.

It is plain that the purpose and effect of the action of the union were to convert the hotels, which were strangers to the dispute between the plaintiff and the union, into allies upon the side of the union and to compel them to drive the plaintiff out of the market by refusing to let rooms to any of the plaintiff's customers who desired to engage his services. Such an arrangement constituted a secondary boycott — a weapon that has long been outlawed here in an industrial struggle. *Burnham* v. *Dowd,* 217 Mass. 351. *New England Cement Gun Co.* v. *McGivern,* 218 Mass. 198. *Cornellier* v. *Haverhill Shoe Manufacturers' Association,* 221 Mass. 554. *Harvey* v. *Chapman,* 226 Mass. 191. *W. A. Snow Iron Works, Inc.* v. *Chadwick,* 227 Mass. 382. *Martineau* v. *Foley,* 231 Mass. 220. *Moore Drop Forging Co.* v. *McCarthy,* 243 Mass. 554. *Armstrong Cork & Insulation Co.* v. *Walsh,* 276 Mass. 263. *Keegan* v. *O'Donnell,* 310 Mass. 346.

Enough appears from the evidence to indicate that damage to the plaintiff would naturally result from the conduct complained of and that he would be entitled to recover for whatever damage he could prove to have been sustained by the action of any of the defendants. *Alden Bros. Co.* v. *Dunn,* 264 Mass. 355, 363–364. *Hubrite Informal Frocks, Inc.* v. *Kramer,* 297 Mass. 530, 535. *Simon* v. *Schwachman,*

301 Mass. 573, 583–584. Indeed, the judge found that there were instances where the plaintiff was discharged by his customers by reason of the action of some members of the union. Wrongful interference with the plaintiff's contractual rights entitled him to damages. *King Features Syndicate, Inc.* v. *Cape Cod Broadcasting Co. Inc.* 317 Mass. 652. *Lane* v. *Epinard,* 318 Mass. 664, 667. *Whittemore* v. *Thompson-Winchester Co. Inc.* 321 Mass. 365, 367. The judge did not reach the question of damages, as he apparently thought that the plaintiff had not established the liability of the defendants. The plaintiff in his brief states that he omitted, with the approval of the judge, to introduce evidence of damages with the understanding that he would not be prejudiced thereby. It was the duty of the plaintiff to see that all matters material to the questions he intended to raise were contained in the record, for we cannot consider matters not appearing therein. *Nelson* v. *Belmont,* 274 Mass. 35, 45. *Lucier* v. *Williams,* 323 Mass. 458, 462–463. *Comstock* v. *Dewey,* 323 Mass. 583, 585. A court of equity should in one proceeding determine all pertinent issues and grant full and complete relief whenever practicable and possible and thus terminate and settle the entire controversy. *Fields* v. *Othon,* 313 Mass. 115, 118. *Porter* v. *Warner Holding Co.* 328 U. S. 395, 399. The bill, which contains only two express prayers, one for a temporary injunction and the other for damages, is to be construed as containing a general prayer for relief. G. L. (Ter. Ed.) c. 214, § 12. *Karas* v. *Karas,* 294 Mass. 230, 231. *Howland* v. *Plymouth,* 319 Mass. 321, 325. *Boylston Housing Corp.* v. *O'Toole,* 321 Mass. 538, 543.

The final decree is reversed, and a final decree with costs is to be entered within thirty days of the date of the rescript enjoining the defendants from coercing, persuading, or attempting to coerce or persuade the owners or operators of hotels which are let for the holding of social functions to refuse to permit the plaintiff to furnish orchestras or bands to play or perform at such places; but if within such period a motion for the assessment of damages is allowed, then the

suit is to be further heard on the matter of damages and a final decree is then to be entered granting the said injunctive relief, damages and costs.

*So ordered.*